[No. B198464. Second Dist., Div. Four. Sept. 3, 2008.]

CHRISTOPHER JONES, Plaintiff and Appellant, v.
P.S. DEVELOPMENT COMPANY, INC., et al., Defendants and
Respondents.

## COUNSEL

Andrews & Hensleigh and Joseph Andrews for Plaintiff and Appellant.

Bullard, Brown and Beal and Jeremy Beal for Defendants and Respondents.

## OPINION

**MANELLA, J.**—In appellant Christopher Jones's action for negligence and products liability, summary judgment was granted in favor of respondents Lloyd Electric Company, Inc. (Lloyd), and P.S. Development Company, Inc., doing business as Comet Electric (Comet). We affirm.

### RELEVANT PROCEDURAL BACKGROUND

On November 23, 2004, Jones filed a complaint against Invision Technologies, Inc. (Invision), containing claims for negligence and products liability. The complaint alleged that Jones, an employee of the Transportation Security Administration (TSA) at Los Angeles International Airport (LAX), had suffered injuries in the course of his duties as the result of a defect in an explosive detection system (EDS) machine. According to the complaint, Jones was injured on August 20, 2003, when he tripped over the mounting bolts that secured the EDS machine. The complaint further alleged that Invision had "negligently or otherwise wrongfully manufactured, designed,

maintained, supplied, distributed, installed, failed to warn, or . . . handled" the EDS machine. Jones later named several other parties as "Doe" defendants, including respondents and the Boeing Company (Boeing).

On October 16, 2006, Boeing filed a motion for summary judgment (Code Civ. Proc., § 437c).[1] Lloyd joined in this motion and asserted its own motion for summary judgment, or alternatively, summary adjudication on Jones's claims.[2] Comet filed a motion for summary judgment on October 20, 2006. In December 2006, Boeing entered into a settlement with Jones and filed a notice withdrawing its motion without "affect[ing] any other summary judgment motion scheduled for hearing." Following a hearing, the trial court granted Lloyd's and Comet's motions, and later denied Jones's motion for reconsideration. Judgment was entered in respondents' favor on March 21, 2007.

## DISCUSSION

Jones contends the trial court erred in granting summary judgment and denying his motion for reconsideration. We disagree.

### A. *Summary Judgment*

#### 1. *Standard of Review*

Generally, "[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The defendant may carry this burden by showing "that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) The defendant need not "conclusively negate" the element; all that is required is a showing "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at pp. 853–854.) Following a grant of summary judgment, we review the record de novo for the existence of triable issues, and consider the evidence submitted in connection with the motion, with the exception of evidence to

---

[1] All further statutory citations are to the Code of Civil Procedure.

[2] Siemens Corporation (Siemens)—which Jones had named as an additional Doe defendant—also joined in Boeing's summary judgment motion. Siemens was later dismissed from the action at Jones's request, and is not a party to this appeal.

which objections were made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].)[3]

In the present case, the parties raised numerous evidentiary objections to the showing proffered by their adversary, which the trial court sustained in part and overruled in part.[4] Generally, the trial court's evidentiary rulings on summary judgment are reviewed for an abuse of discretion. (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169 [121 Cal.Rptr.2d 79]; see *Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928–929 [19 Cal.Rptr.3d 254].) With the exception of the objections discussed below, Jones does not challenge these rulings on appeal, and to that extent, has forfeited any contention of error regarding the rulings.

Jones has also forfeited any contention that summary judgment was improper with respect to his claim for products liability against respondents. Lloyd sought summary adjudication on the products liability claim on the ground that it had neither designed nor manufactured the EDS machine or its mounting bolts; although Comet did not expressly request summary adjudication on the claim, its motion for summary judgment also argued that the claim against it failed for the same reason. In granting summary judgment, the trial court determined that neither Lloyd nor Comet had designed or manufactured the EDS machine or its mounting bolts, and that Jones had failed to oppose their motions on this issue. Because Jones does not address this ruling on appeal, we limit our inquiry to his claim for negligence. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125–126 [36 Cal.Rptr.3d 6] [Although review of summary judgment is de novo, review is limited to issues adequately raised in the appellant's brief.]; see *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377, 1398 [82 Cal.Rptr.2d 304]; *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].)

## 2. *Contractor's Liability After Completion and Acceptance of Work*

The key issues before us concern the application of the so-called "completed and accepted" doctrine, which in some circumstances shields contractors from liability for negligence. (6 Witkin, Summary of Cal. Law (10th ed.

---

[3] Motions for summary adjudication are subject to the same rules and procedures as motions for summary judgment. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56].) Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.)

[4] The trial court also failed to rule on many of Jones's objections. To the extent he failed to request decisions on these objections at the hearing on the motions, they are forfeited. (§ 437c, subd. (d).)

2005) Torts, § 1160, pp. 516–518.) In granting summary judgment, the trial court relied on this doctrine, as explained in *Sanchez v. Swinerton & Walberg Co.* (1996) 47 Cal.App.4th 1461 [55 Cal.Rptr.2d 415] (*Sanchez*). There, a general contractor hired a subcontractor to construct the entrance stairway and landing for a new building. (*Id.* at p. 1464.) Two years after the building was completed, the plaintiff slipped on rainwater that had pooled on the landing, and initiated a negligence action against the general contractor and subcontractor. (*Ibid.*)

■ Following an examination of California case authority, the appellate court determined that when a contractor completes work that is accepted by the owner, the contractor is not liable to third parties injured as a result of the condition of the work, even if the contractor was negligent in performing the contract, unless the defect in the work was latent or concealed. (*Sanchez, supra,* 47 Cal.App.4th at pp. 1466–1471.) The rationale for this doctrine is that an owner has a duty to inspect the work and ascertain its safety, and thus the owner's acceptance of the work shifts liability for its safety to the owner, provided that a reasonable inspection would disclose the defect. (*Id.* at pp. 1466–1467.)

Applying this doctrine to the circumstances before it, the *Sanchez* court concluded that the defendants were not liable for the plaintiff's injuries because the owner and its employees had long been aware that rainwater pooled on the landing. (*Sanchez, supra,* 47 Cal.App.4th at pp. 1470–1471.) It reasoned: "In the context of a patent defect, the word 'patent' ' "refers to the patency of danger and not merely to exterior visibility." ' [Citation.] Here, the danger itself was patent as a matter of law; it would be discovered by the inspection an owner would make in the exercise of ordinary care and prudence [citations], for, as a matter of ordinary prudence, one would test whether water accumulated on the uncovered landings of stairways into buildings. The obvious nature of the defect would allow the owner and users to take steps to remedy the condition or to take precautions against injury. [¶] In fact, it is undisputed that the dangerous condition was observed by the owner's agents, and the risk it entailed was appreciated, on several occasions preceding [plaintiff's] accident. Even if the defect initially could have been considered latent, once it was discovered, it became patent. [Citation.]" (*Ibid.*)

### 3. *Parties' Showings*

In seeking summary judgment, Lloyd and Comet submitted evidence that their work on the pertinent EDS machine had been completed and accepted prior to Jones's injuries. Their evidence supported the following version of the underlying facts: In June 2002, TSA engaged Boeing to provide architectural, mechanical, and electrical facilities to support the installation of EDS

machines manufactured by Invision at more than 400 domestic airports. Boeing hired Lloyd to perform electrical work on EDS machines at LAX, and install seismic anchors on them. In turn, Lloyd hired Comet to install the anchors. Boeing also engaged a structural engineer to design the anchoring system for LAX. After the structural engineer obtained approvals for its design drawings from TSA and the City of Los Angeles (City), Boeing issued the drawings to Lloyd, which forwarded them to Comet.

Lloyd submitted a declaration from Doug Waldo, a former Lloyd employee who supervised the project for Lloyd from November 2002 to July 25, 2003. According to Waldo, Lloyd's limited role in the installation of the anchors was completed prior to Jones's accident on August 20, 2003. Lloyd neither designed the anchors nor provided them to Comet. Under the pertinent contracts, Comet was responsible for obtaining the seismic anchors, installing them, and obtaining approvals from the City and any other governing body from which approval was necessary. Waldo's duties were limited to acting as a liaison between Boeing and Comet: he passed information and paperwork between Boeing and Comet, and kept a log of Comet's activities for Boeing. He did not supervise, inspect, or direct Comet's work, and was not expected to do so. After July 25, 2003, when Lloyd's work on the site was completed, Lloyd had no access to or control over the EDS machines. Lloyd was never asked to return to the site to make changes or repairs to the anchors.

Comet submitted evidence that its role in the project was limited to installing the specified anchors on EDS machines at LAX, and that its work on the machine that Jones had identified as the source of his injuries was completed and accepted prior to his accident. In a deposition and elsewhere, Jones identified the pertinent machine as "Number 4" or "CTX-4" in his work area within the Tom Bradley International Terminal. According to a declaration from Keith Berson, Comet's vice-president, Comet completed the installation of anchor brackets and bolts on this machine in June 2003, two months before Jones's accident. TSA accepted the machine and put it into full operation prior to the accident.

Pointing to Jones's deposition testimony, Comet also asserted that Jones and TSA knew that the anchors on the machine posed a hazard before Jones suffered his injuries. Jones testified that a barrier shielded the machine from passengers, who were required to wait behind the barrier while TSA employees placed their luggage in the machine. Prior to the accident, he noticed protruding bolts on the anchors, and tried to steer clear of the bolts as he walked around the machine. He discussed the hazard with his coworkers, and mentioned it to a "lead" in his chain of command. On the date of the accident, he tripped over a bolt as he carried a box around the EDS machine. According to Jones, he was aware of the bolt before he fell, but misjudged his distance from the bolt.

The bulk of Jones's evidentiary showing was directed at establishing triable issues regarding the completion and acceptance of Comet's work. He argued that Comet began installing anchors on the machines in his work area after July 22, 2003, relying on deposition testimony from Luis Briones, Comet's onsite job foreman, who stated that Comet did not obtain anchor brackets until that date. In addition, Jones cited deposition testimony from Berson, who admitted that his declaration statement regarding the completion date of Comet's work on the pertinent machine "could be off by a month or two."

Moreover, Jones contended that Comet completed its work on the project no earlier than November 2003, and that the work was not accepted until December 2003. According to Jones's evidence, Twining Laboratories, an inspection company, examined the anchors on numerous EDS machines at LAX on or before August 16, 2003, and found that the bolts on some machines had failed. Comet replaced the defective bolts, and maintained workers at LAX through October 2003. Jones also submitted evidence that the Department of Building and Safety of the City of Los Angeles (Department) did not approve the electrical work on the EDS machines until December 2003.

Regarding Lloyd's showing, Jones contended that there were triable issues whether Lloyd retained responsibility for Comet's work after July 25, 2003. He pointed to provisions in Lloyd's contract with Boeing obliging Lloyd to monitor its subcontractors, as well as the evidence regarding Comet's work between July and October 2003, and the approval of the electrical work in December 2003.

### 4. Analysis

In granting summary judgment in respondents' favor, the trial court concluded that the "completed and accepted" doctrine, as explained in *Sanchez*, shielded Lloyd and Comet from liability. On appeal, Jones does not dispute that the hazard posed to TSA employees was patent when Jones was injured, in view of Jones's knowledge of the hazard and his communications with his "lead." His central contentions are (1) that *Sanchez* misstates the governing legal principles, and (2) that there are triable issues regarding the completion and acceptance of respondents' work on the pertinent machine.

#### a. Vitality of the "Completed and Accepted" Doctrine

Jones contends that the "completed and accepted" doctrine was abrogated in *Stewart v. Cox* (1961) 55 Cal.2d 857 [13 Cal.Rptr. 521, 362 P.2d 345] (*Stewart*), and thus *Sanchez* misstates California law. He argues that *Stewart*

and its progeny, especially *Stonegate Homeowners Assn. v. Staben* (2006) 144 Cal.App.4th 740 [50 Cal.Rptr.3d 709] (*Stonegate*), govern the issues presented in this case. We disagree.

In *Stewart*, a subcontractor was negligent in applying concrete to a swimming pool. (*Stewart, supra,* 55 Cal.2d 857 at pp. 859–860.) After the subcontractor finished his work, the owners noticed a crack in the pool, which the subcontractor covered with plaster. (*Id.* at p. 860.) Despite the repairs, water escaped from the pool, damaging the owners' house. (*Ibid.*) The owners initiated an action for negligence against the subcontractor and prevailed at trial. (*Ibid.*)

In addressing whether the subcontractor had a duty of care to the owners in the absence of privity of contract, our Supreme Court noted the then extant authority on the "completed and accepted" doctrine, and concluded that the subcontractor's liability to the owner was properly determined by reference to the multifactored test stated in *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16]. (*Stewart, supra,* 55 Cal.2d at pp. 862–863.) This test involves a case-specific "balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the policy of preventing future harm." (*Id.* at p. 863.) Applying this test, the court determined that the subcontractor was not exempt from liability to the owners if his negligence caused damage to them. (*Ibid.*) In so concluding, the court rejected a contention that the subcontractor was shielded from liability by the owners' acceptance of the pool, reasoning that the owners were not experts on pools, and thus could not recognize the hazards posed by the crack in the pool. (*Id.* at p. 865.)

In *Stonegate*, a general contractor hired a subcontractor to install waterproofing and drainage in a condominium project. (*Stonegate, supra,* 144 Cal.App.4th at p. 742.) When seepage and drainage problems arose after the project's completion, the owners' association sued the general contractor and subcontractor for negligence. (*Ibid.*) The trial court granted nonsuit in the subcontractor's favor on the grounds that the general contractor had misinstructed it about the scope of the work to be performed. (*Id.* at p. 744.) Applying *Stewart*, the appellate court reversed, concluding there were triable issues as to whether the subcontractor had complied with the standard of care governing its duties to the owners' association. (*Stonegate, supra,* 144 Cal.App.4th at pp. 748–749.)

Jones's reliance on *Stewart* and *Stonegate* is misplaced, as they are distinguishable: both cases address a subcontractor's duty of care to owners

who lacked a reasonable opportunity to cure a construction defect before it caused their damages. Nor are we persuaded that *Stewart* abrogated the "completed and accepted" doctrine. After *Stewart*, our Supreme Court relied on case authority regarding the doctrine in *Chance v. Lawry's, Inc.* (1962) 58 Cal.2d 368 [24 Cal.Rptr. 209, 374 P.2d 185] (*Chance*). There, the court looked to this authority in determining the outcome of the multifactored test embraced in *Stewart*. (*Chance,* at pp. 377–379.) In view of *Chance* and subsequent cases, the court in *Sanchez* concluded the case authority in question retains its vitality, and provides guidance on questions of contractor liability, unless the multifactored test dictates a departure from the doctrine. (See *Sanchez, supra,* 47 Cal.App.4th at pp. 1470–1472.) We agree with the *Sanchez* court on this matter. Moreover, Jones offers no argument that the *Biajanka* factors, when weighed in the specific circumstances of this case, mandate the displacement of the "completed and accepted" doctrine.

### b. *Completion and Acceptance*

We turn to Jones's remaining contention regarding the application of the doctrine. Few cases have addressed the circumstances under which a contractor's work has been deemed completed and accepted for purposes of the doctrine. In *Klingenstein v. Miehle P. P. etc. Co.* (1919) 41 Cal.App. 352, 352–353 [182 P. 768] (*Klingenstein*), a manufacturer sold a printing press, and hired a contractor to convey the press to the buyer, where an employee of the manufacturer was to install the press. Under the contract between the manufacturer and the contractor, the manufacturer was entitled to hire the contractor's workers to help in the installation of the press. (*Id.* at p. 354.) After the contractor delivered the press to the buyer's business floor, the manufacturer's installer directed the contractor's workers to assist him in setting up the press. (*Id.* at p. 355.) In the course of this process, the press tipped over and killed a worker. (*Ibid.*) After a jury found the manufacturer solely responsible for the death, the appellate court affirmed, reasoning that prior to the accident the contractor had discharged his contract, and the manufacturer's installer had asserted control over the workers. (*Id.* at pp. 355–356.)

In *Hall v. Barber Door Co.* (1933) 218 Cal. 412, 414 [23 P.2d 279] (*Hall*), a subcontractor was engaged to install the doors in a new commercial building. A tenant took possession of space in the building with the knowledge that the subcontractor had not finished its work on the large door to the space: the door had been hung, but some fittings and safety devices had not been installed. (*Id.* at p. 416.) When the door fell and injured the tenant, the trial court granted nonsuit on the tenant's claim for negligence against the subcontractor. (*Id.* at p. 415.) Our Supreme Court reversed, reasoning that the subcontractor had a duty of care to the tenant as long as the subcontractor retained control over the door. (*Id.* at p. 419.)

In *Chance, supra*, 58 Cal.2d at pages 372–373, a restaurant engaged a contractor to remodel its entrance. After the contractor finished installing a planter box in the foyer, his workers moved on to other work in the foyer. (*Ibid.*) A patron visiting the restaurant fell into the planter box and asserted claims for negligence against the restaurant and the contractor. (*Ibid.*) Our Supreme Court affirmed jury verdicts against both defendants, reasoning that although the contractor had finished the planter box, he could have directed his workers—who were still engaged in work in the foyer—to take precautions to eliminate the hazards it posed. (*Ibid.*)

Here, the evidence indisputably establishes that prior to Jones's accident, the anchors had been installed on the machine, and TSA had put the machine into service in an area reserved for TSA employees; moreover, as we elaborate below (see pt. A.6., *post*), none of the evidence brought to the trial court's attention suggests that respondents performed work on the machine after the anchors had been installed. Nonetheless, Jones's showing indicates that respondents had not fully discharged their contractual duties with respect to the entire project: Comet maintained workers in other TSA areas until October 2003, and the Department did not approve the electrical work on the machines until December 2003.

The case before us thus falls between *Klingenstein*, on one hand, and *Hall* and *Chance*, on the other. Like the contractor in *Klingenstein*, respondents had completed their work on the machine in question, but unlike that contractor, they may have remained under contractual obligations regarding the larger project. In this respect, respondents resemble the contractors in *Hall* and *Chance*, but unlike those contractors, there is no evidence that respondents retained any control over the machine at the time of the accident.

■ In our view, the rationale underlying the "completed and accepted" doctrine is dispositive of the question before us. As the court explained in *Sanchez*, liability for the safety of a contractor's work shifts to the owner upon acceptance of the work, that is, when the owner has had an opportunity to examine the work, and thereafter represents that it is safe: " 'By acceptance and subsequent use, the owners assume to the world the responsibility of its sufficiency, and to third parties, the liability of the contractors has ceased, and their own commenced.' [Citation.] In other words, having a duty to inspect the work and ascertain its safety before accepting it, the owner's acceptance represents it to be safe and the owner becomes liable for its safety." (*Sanchez, supra*, 47 Cal.App.4th at p. 1466, quoting *Boswell v. Laird* (1857) 8 Cal. 469, 498.) ■ Here, there are no triable issues regarding these matters: prior to Jones's accident, TSA had put the machine with the installed anchors into full operation, and Jones, his coworkers, and a "lead"

were, in fact, aware of the hazard. As there is no evidence that respondents retained control over the machine, we conclude that they are not liable for Jones's injuries.

Jones contends that there are triable issues regarding Lloyd's contractual duties and the precise date that Comet installed the anchors. We disagree. The "completed and accepted" doctrine shields Lloyd from liability for negligence in the discharge of its duties after TSA accepted Comet's installation of the anchors on the pertinent machine. As we have explained, there is no triable dispute whether TSA had accepted Comet's completed work before Jones's accident.

Jones also contends that other conflicts in the evidence preclude summary judgment. He argues that there is no evidence that TSA was authorized to accept the machine until the City approved the work performed under its permits, which occurred on December 9, 2003. In our view, the record discloses no triable dispute about the owner or possessor of the machine. Generally, the duty of care that underpins the "completed and accepted" doctrine falls upon the owner or possessor of the thing in question. (See 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1083, pp. 407–408.) Here, respondents' showing that the machine and its anchors were installed pursuant to the contract between TSA and Boeing is sufficient to establish that TSA owned the machine. Indeed, Jones does not contend otherwise.

By contrast, there is no evidence that the City also owned or possessed the machine. Generally, "[a] party cannot avoid summary judgment based on mere speculation and conjecture [citation], but instead must produce admissible evidence raising a triable issue of fact. [Citation.]" (*Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524 [80 Cal.Rptr.2d 94].) The City's status as owner or possessor depends upon its relationship to the machine or the premises on which it was located. (See *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1157–1166 [60 Cal.Rptr.2d 448, 929 P.2d 1239]; 6 Witkin, Summary of Cal. Law, *supra*, Torts, §§ 1082–1084, pp. 405–409.) Jones points to three items of evidence bearing on this relationship: (1) a declaration from Stephen K. Cassens, a Boeing manager and engineer, who stated that the City approved the plans for the anchors that were forwarded to Lloyd and Comet; (2) the statement in Doug Waldo's declaration that Comet was obligated to obtain the final inspection of the anchors after it completed their installation from the City "and any other governing bodies from whom final installation approval was required"; and (3) the Department's approval of work done under electrical building permits on December 9, 2003. Although this evidence shows that the City and the Department scrutinized the project to ensure compliance with applicable building codes, nothing in it raises the reasonable inference that the City was, in fact, an owner or possessor of the machine or its premises for purposes of the applicable duty of care.

On a related matter, Jones contends that there is a triable issue whether TSA's acceptance of the machine was predicated on an inspection and approval by Twining Laboratories. Again, we disagree. Jones's sole evidence for this contention is the following excerpt from the deposition of Keith Berson, Comet's vice-president:

"Q. [By Jones's counsel.] Are there documents you are aware of that I could look at that would say when *anyone* accepted the seismic anchors on that particular machine, the CTX-4, as properly done?

"A. I think the inspection records you just got from Twining were the ones who accepted the installation.

"Q. Any other documents you are aware of?

"A. Not that I'm aware of." (Italics added.)

This testimony, read in context, establishes that the only entity Berson knew to have documented its acceptance was Twining Laboratories, not that TSA predicated its acceptance upon an approval from Twining Laboratories. Here, TSA's acceptance is manifested by its conduct regarding the machine.[5]

---

[5] Aside from Jones's contentions regarding the application of the "completed and accepted" doctrine, he also challenges summary judgment in Lloyd's favor on two other grounds related to the trial court's reliance on *Hughes v. Atlantic Pacific Construction Co.* (1987) 194 Cal.App.3d 987 [240 Cal.Rptr. 200] (*Hughes*). As explained below, these contentions fail in light of the record.

In granting Lloyd's motion for summary judgment, the trial court reasoned that because Waldo's declaration stated that Lloyd was not obliged to supervise or inspect Comet's work, the burden on summary judgment shifted to Jones to present evidence of Lloyd's negligence. In so concluding, the trial court cited *Hughes*, in which the court stated: "[A] contractor would not ordinarily be liable for the acts or omissions of a subcontractor engaged by [the contractor], over which the [contractor] had no control or right of control. [Citations.]" (*Hughes, supra*, 194 Cal.App.3d at p. 997.)

Jones argues that summary judgment was erroneously granted on the basis of the principle stated in *Hughes* because there are triable issues regarding whether Lloyd had a contractual obligation to supervise or direct Comet. He also suggests the trial court's ruling improperly implicates the so-called "peculiar risk" doctrine, an exception to the aforementioned principle that is discussed in *Hughes*. (*Hughes, supra*, 194 Cal.App.3d at pp. 997–1001.) We disagree. The trial court determined only that Lloyd had carried its initial burden on summary judgment on the basis of the *Hughes* principle. In view of Waldo's declaration (which we discuss further below), we see no error in this ruling. Moreover, even if Jones raised triable issues regarding Lloyd's supervisory duties, the trial court properly granted summary judgment on the basis of the "completed and accepted" doctrine, which shields a contractor from liability for negligence in its work after the work has been completed and accepted.

### 5. *Waldo's Declaration*

Jones contends that the trial court considered inadmissible evidence in granting Lloyd's motion for summary judgment. Under our summary judgment statute, supporting and opposing declarations "shall be made . . . on personal knowledge, . . . and shall show affirmatively that the [declarant] is competent to testify to the matters stated in the affidavits or declarations." (§ 437c, subd. (d).) Jones argues that the trial court erred in overruling his objections that Waldo's declaration contained improper legal opinion, and vague and conclusory statements not supported by personal knowledge.

■ Jones contends that Waldo offered inadmissible opinions on questions of law, namely, Lloyd's duties under its contracts with Boeing and Comet. Generally, even lawyers may not testify as to legal conclusions. *(California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 67 [221 Cal.Rptr. 171]; *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 842 [199 Cal.Rptr. 830].) Nonetheless, in interpreting a contract, courts may properly consider the acts and conduct of the parties following the contract's execution. *(City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 472 [80 Cal.Rptr.2d 329].) As Witkin explains, "[t]he conduct of the parties may be, in effect, a *practical construction* thereof, for they are probably least likely to be mistaken as to the intent." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 749, p. 838.) Here, Waldo, who was Lloyd's onsite supervisor, described his understanding of Lloyd's contractual duties in the context of his discharge of those duties. In our view, the trial court did not err in consulting Waldo's declaration to resolve Jones's contentions about Lloyd's duties under the contracts.

■ Pointing to Waldo's statement that he was not on the project's site after Lloyd completed its work on July 25, 2003, Jones contends that he lacked personal knowledge of events following that date. Pertinent to the application of the "completed and accepted" doctrine are Waldo's statements that upon Lloyd's completion of its work, it had no control over the EDS machines, and that it was not asked to return to LAX to repair the anchors. Again, we see no error in the trial court's ruling. Aside from Waldo's statement that he had personal knowledge of the facts stated in the declaration, his status as Lloyd's project supervisor rendered him competent to testify that Lloyd's work ended at the site on July 25, 2003, and that he received no complaints about Comet's installation. (See *Roy Brothers Drilling Co. v. Jones* (1981) 123 Cal.App.3d 175, 182 [176 Cal.Rptr. 449] [objection to declaration is properly overruled, despite declarant's failure to make express assertion of personal knowledge, when declaration otherwise establishes such knowledge].)

### 6. *Incident Report*

Jones also challenges summary judgment on other grounds arising from his receipt of TSA reports regarding his accident after respondents sought summary judgment.

#### a. *Underlying Proceedings*

In seeking summary judgment, respondents relied upon Jones's deposition testimony, in which he referred to the pertinent machine as "CTX-4." Jones's original oppositions to the motions for summary judgment were filed on December 21, 2006. In the opposition to Comet's motion, Jones applied for a continuance, asserting that his counsel, Joseph Andrews, saw some incident reports regarding Jones's accident and other documents in Comet's possession during a mediation on December 15, 2006. Jones's request for a continuance sought "time to incorporate [the] documents into his [o]pposition, or . . . leave to file any relevant documents obtained from [Comet] as supplemental documents." According to the opposition, the incident reports identified the machine involved in the accident as CTX-8, rather than CTX-4. Accompanying the opposition was a declaration from Andrews, who stated that he was unable to file copies of the documents in question because the copies he had obtained by fax from Comet were unreadable.

On December 26, 2006, Jones filed supplemental pleadings in opposition to the summary judgment motions, as well as copies of the documents Andrews had obtained from Comet. Among these documents are four TSA incident reports, including Jones's own report, which stated that his accident occurred at "CTX-8." Comet's reply responded that these reports failed to raise a triable issue of material fact because the pertinent machine's designation code was irrelevant: Jones had testified that he and his "lead" knew about the hazard posed by the machine—however denominated—that was involved in his accident. At the hearing on the motions, the trial court invited and heard argument on whether summary judgment was proper in light of the dispute over the designation code of the pertinent machine. In granting summary judgment, the trial court impliedly concluded that Jones's incident report did not raise a triable dispute about a material fact.

#### b. *Analysis*

Jones argues (1) his incident report raised a triable issue of material fact regarding the identity of the machine involved in his accident; (2) the trial court denied him due process by permitting respondents to change their assertions regarding the identity of the pertinent machine in their moving papers; and (3) the trial court improperly denied his request for a continuance of the hearing on the motions. None of these contentions has merit.

The trial court properly determined that the incident reports did not preclude summary judgment. Under the circumstances of this case, the precise designation code of the machine in question is irrelevant to the application of the "completed and accepted" doctrine. There is no dispute that the seismic anchors had been installed on the machine prior to Jones's accident.[6]

Moreover, the trial court properly granted summary judgment despite respondents' initial designation of the pertinent machine as "CTX-4" in their moving papers.[7] Here, Jones first submitted the incident reports in opposition to the motions for summary judgment, and the trial court accorded all the parties ample opportunity to address whether the reports raised a triable issue before it ruled on the summary judgment motions. There was no denial of due process.[8]

---

[6] On appeal, appellant contends that the record contains evidence establishing that the machine's designation code is potentially relevant to respondents' liability for his injuries. He points to a Twining Laboratories report dated August 9, 2003, which states that eight mounting bolts had failed on a CTX machine in the Tom Bradley International Terminal designated "TBC8." As the machine mentioned in the report is of the kind involved in Jones's accident and its designation contains an "8," he argues there is a triable issue whether Comet was responsible for repairs on the machine involved in his accident when it occurred. We disagree. In view of the differences between "TBC8" and "CTX-8," the inference that they designate the same machine is speculation.

Moreover, before the trial court, Jones never raised this contention or singled out the portion of the Twining Laboratories report on which it rests. In ruling on a motion for summary judgment, the trial court may properly disregard evidence that "is not referenced, is hidden in voluminous papers, and is not called to the attention of the court at all." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 316 [125 Cal.Rptr.2d 499].) That is the case here. Jones's separate statements asserted that Comet worked on the project from July to October 2003, but described the supporting evidence simply by referencing exhibits encompassing more than a hundred pages of documents. The separate statements neither identified the pertinent portion of the report nor suggested its relevance to Jones's contention; nor did Jones bring the contention to the trial court's attention in any other fashion, despite having had a full opportunity to do so.

[7] In ruling on a motion for summary judgment, the trial court has the discretion to consider evidence not mentioned in a party's separate statement, and to permit amendments to the party's submissions, provided the opponent is afforded an adequate opportunity to address the evidence or amendments. (See *San Diego Watercrafts, Inc. v. Wells Fargo Bank, supra*, 102 Cal.App.4th at pp. 315–316 [trial court has discretion to consider evidence outside separate statements in granting summary judgment, as long as trial court exercises discretion in light of due process considerations]; *Weiss v. Chevron, U.S.A., Inc.* (1988) 204 Cal.App.3d 1094, 1098–1099 [251 Cal.Rptr. 727] [trial court properly granted summary judgment on basis of declaration initially omitted from moving party's showing because "the opposing party . . . had notice and the opportunity to respond" to it].)

[8] On a related matter, Jones argues the trial court improperly considered evidence that Comet first submitted with its reply to Jones's opposition. To support Comet's contention that it had not improperly withheld the incident report in discovery, Comet's reply was accompanied by declarations from its counsel, Jeremy Beal, and Derrick Ford, an attorney representing

Finally, the trial court did not err in connection with Jones's request for a continuance. The summary judgment statute provides: "If it appears from the affidavits submitted in opposition to a motion for summary judgment or summary adjudication or both that facts essential to justify opposition may exist but cannot, for reasons stated, then be presented, the court shall deny the motion, or order a continuance to permit affidavits to be obtained or discovery to be had or may make any other order as may be just." (§ 437c, subd. (h).) We review the trial court's ruling for abuse of discretion. (*Scott v. CIBA Vision Corp.* (1995) 38 Cal.App.4th 307, 326 [44 Cal.Rptr.2d 902].) Here, Jones requested nothing more than an opportunity to submit the newly obtained documents, including the incident reports, in opposition to the motions for summary judgment.[9] Although the trial court did not expressly rule on this request, the record discloses that the trial court, in fact, permitted Jones to submit the documents. There was no error.

### B. *Motion for Reconsideration*

■ Jones contends that the trial court erred in denying his motion for reconsideration. When, as here, a party files a motion under section 1008 for reconsideration of a ruling on a summary judgment motion, the trial court may not grant the motion unless it satisfies the requirements of section 1008. (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1108 [29 Cal.Rptr.3d 249, 112 P.3d 636]; *New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 211 [37 Cal.Rptr.3d 338] (*New York Times*).) As this court stated in *New*

---

TSA, who described the events by which Comet obtained the report. Comet also submitted evidence on other matters (much of which had already been submitted), and a response to Jones's separate statement.

Jones contends that Comet improperly served its reply and accompanying evidence at the hearing on the motions on January 3, 2007. However, the record discloses that Comet served and filed the documents on December 29, 2006, in compliance with the summary judgment statute. (§ 437c, subd. (b)(4) ["Any reply to the opposition shall be served and filed by the moving party not less than five days preceding the . . . hearing . . . ."].) Jones offers no argument that the method by which Comet served the reply papers was not "reasonably calculated to ensure delivery to the other party . . . not later than the close of the next business day after the . . . reply papers . . . [were] filed" (§ 1005, subd. (c)), and thus has forfeited any such contention.

Jones also suggests that Comet's showing contained fresh evidence regarding the identity of the machine involved in his accident. Because he has not pointed out this evidence (and we are unaware of any such evidence), he has forfeited this contention. Moreover, for the reasons explained above, Jones's incident report raised no triable issue, regardless of Comet's showing in connection with its reply.

[9] On appeal, Jones suggests that his request for a continuance asserted that his belated receipt of the incident reports and other documents impaired his ability to depose two witnesses, Kay Van Meter and Deon Kimble. No reference to these witnesses appears in his request, which sought only an opportunity to submit the documents.

*York Times*: "Section 1008, subdivision (a) requires that a motion for reconsideration be based on new or different facts, circumstances, or law. A party seeking reconsideration also must provide a satisfactory explanation for the failure to produce the evidence at an earlier time. [Citation.]" (*New York Times, supra*, 135 Cal.App.4th at p. 212.) The trial court's ruling on a motion for reconsideration under section 1008 is reviewed for an abuse of discretion. (*Ibid.*)

In seeking reconsideration, Jones contended that the trial court's ruling on the summary judgment motions was based on "multiple errors of law and a failure or refusal to consider the evidence presented in opposition to the motion[s]"; in addition, he contended that Waldo's deposition testimony, which was unavailable before the hearing on the motions, raised triable issues of fact. Because Jones's first contention does not constitute a new fact or circumstance supporting reconsideration (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1500 [38 Cal.Rptr.2d 626]), the focus of our inquiry is his second contention.[10]

Jones's motion asserted that Waldo, when deposed, testified that he had supervised and inspected Comet's work, that anchor bolts on some of the machines may have been too long, and that Comet had been obliged to obtain the City's final inspection and approval of the work on the building permit. The motion also argued that Waldo had been unavailable for a deposition until January 12, 2007, after the hearing on the summary judgment motions.

In support of the motion, Jones submitted evidence that he sought to depose Lloyd's "person most knowledgeable" in July 2006, and noticed Waldo's deposition for November 15, 2006. Jones also submitted a letter dated December 22, 2006, from his counsel, Joseph Andrews, to Lloyd's counsel, Sandra Montag. The letter stated: "After we noticed Mr. Waldo's deposition in mid-November, your office agreed to produce him for deposition, but requested that we defer the deposition until after the Thanksgiving holiday. We honored your request. Since then, my secretary, Pattie Morse, has

---

[10] On appeal, Jones suggests that other contentions first raised in his reply to the oppositions to his reconsideration motion mandated the granting of the motion. We disagree. Jones's reply argued that there was new evidence that TSA had used the EDS machines before the anchors had been installed, and that the bolts on the machine involved in Jones's accident were too long. In support of these contentions, Jones pointed to excerpts from the deposition of Stephen K. Cassens, the Boeing manager, taken in November 2006, and the depositions of David Kirkpatrick, Kay Van Meter, and Deon Kimble, taken after the hearing on the summary judgment motions. As Jones offered no explanation for his failure to present or obtain such evidence prior to the ruling on the summary judgment motions, the trial court properly rejected Jones's contentions predicated on this evidence.

called your office for dates a number of times, and despite repeated statements that your office would provide dates, you have not done so. . . . [¶] Please advise us by no later than December 28, 2006, whether Mr. Waldo is available for deposition on January 10, 11, 12, 16, 18, or 19, 2007."

In response to this showing, Lloyd submitted a declaration from Montag, who stated she was on vacation during November 2006, and unavailable to appear for Waldo's deposition, then set for mid-November 2006. At Montag's request, an associate attorney in Montag's office contacted Andrews, asked him to postpone the deposition, and offered to make Waldo available for deposition in early December 2006. Andrews, through his secretary, Pattie Morse, indicated that Waldo's deposition was not needed for Jones's oppositions to the motions for summary judgment, and that Waldo's deposition could be delayed.

Jones's reply was accompanied by declarations from Morse and Andrews. Morse stated that she left voice messages for Lloyd's counsel on November 16 and 17, 2006, that "the week of 12/4 [was] okay for [the] Waldo deposition." On December 4, 2006, she spoke with "Judy" and discussed dates in mid-December 2006 for Waldo's deposition; later that day, she called Judy, advised her that the deposition need not occur before December 20, and discussed dates in late December and early January. On December 8 and 18, 2006, she again spoke to Judy about these dates. Andrews's declaration stated that he went on vacation in Texas during the pertinent holidays.

In denying reconsideration, the trial court found that Andrews knew about Waldo, but failed to take his deposition in early December 2006, when Montag offered to make Waldo available for a deposition; in addition, it found that Jones never requested a continuance to obtain Waldo's testimony.[11] In our view, the trial court properly determined that Jones had failed to provide an adequate explanation for his failure to obtain Waldo's deposition testimony in early December 2006. Aside from Lloyd's evidence that Andrews informed Lloyd's counsel that Waldo's deposition was unnecessary for Jones's opposition, Morse's declaration acknowledged that she told "Judy" that Waldo's deposition need not be set before December 20, 2006— the due date for the opposition (§ 437c, subd. (b)(2) ["Any opposition to the motion shall be served and filed not less than 14 days preceding the . . . hearing . . . ."]). Moreover, as we have explained (see pt. A.6., *ante*), Jones's request for a continuance sought only an opportunity to submit the incident reports and other documents, not to depose Waldo. Accordingly, the motion for reconsideration was properly denied.

---

[11] The trial court also concluded that Waldo's deposition testimony raised no triable issues of material fact.

## DISPOSITION

The judgment is affirmed. Respondents shall have their costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

A petition for a rehearing was denied October 15, 2008, and appellant's petition for review by the Supreme Court was denied December 10, 2008, S167489.